IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

GARY MARTIN,                              )
                                          )
                     Plaintiff,           )
                                          )
vs.                                       )        Case No. 3:20-CV-00276-MAB
                                          )
CENTRAL STATE CONSTRUCTION                )
INCORPORATED,                             )
                                          )
                     Defendant.           )

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

Presently before the Court is Defendant Central State Construction, Incorporated's motion for summary judgment (Doc. 39). For the reasons outlined below, the motion will be granted.

## BACKGROUND

Plaintiff Gary Martin ("Martin") originally filed this case on March 16, 2020, invoking the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332 (Doc. 1). The operative complaint, filed April 10, 2020, advances a multitude of claims against Martin's former employer, Central State Construction, Incorporated ("Central State") (Doc. 19). Specifically, Martin alleged nine claims against Central State, including fraud, constructive fraud, fraud by concealment, negligent misrepresentation, negligence, intentional infliction of emotional distress, negligent infliction of emotional distress, punitive damages, and injunctive relief.

I.       **Martin begins work with Central State and receives the Citibank credit card**

Martin's claims all stem from his employment as Central State's Assistant Vice President for Plumbing Operations in Indiana, which began on December 1, 2017 (Doc. 39-4). Larry Yargus was the President and sole owner of Central State. Ronald Stone worked as the Senior Vice President and Erica Reedy worked as the Secretary. The company was organized in October 2017 (Doc. 42-2, pp. 2-3).

On November 16, 2017 Martin sent an email to Mr. Stone asking if he would be provided with a company credit card to use for business expenses (this was prior to Martin's first day of work at Central State) (Doc. 39-3). On or around December 4, 2017, Mr. Yargus gave Martin's name and home address to Citibank Mastercard so that he could become an authorized user on his personal credit card as opposed to a traditional company credit card (Doc. 42-2, p. 5; 39-18, p. 6). Central State did not have a company credit card at that time, so it used Mr. Yargus's personal credit card (Doc. 39-19). Other employees of Central State also became authorized users and received a credit card for company use (Doc. 39-20, pp. 3-6). Mr. Yargus indicated that he did benefit as a result of this arrangement because it increased his personal air mile credits (Doc. 42-2, pp. 7-8). When Mr. Yargus requested that his employees, including Martin, be added to this account as authorized users, he never inquired whether it would have any impact on their credit scores (*Id.* at p. 8).

Mr. Stone, the Senior Vice President, gave Martin the credit card and told him it was a "company credit card that [Martin] could use with his name on it" (Doc. 42-3,p. 2). However, Mr. Stone acknowledged that the card did not say "Central State" on it. *Id.* Mr.

Stone recalls that Ms. Reedy is the one who initially gave him Martin's card and informed him that it was a card on Mr. Yargus's account. *Id.* Martin testified he felt nervous about accepting the credit card because it had his own name on it instead of the company name (Doc. 42-5, pp. 8-9). Martin testified he reluctantly accepted the credit card after Mr. Stone advised him that it would not affect him in any way (*Id.* at p. 9). The credit card is a Citibank credit card ending in 8873 (Doc. 39, p. 3).

## II.    Martin's loan application with Elements Financial

On February 14, 2018, Martin applied for a construction loan to build his new home with Elements Financial and was pre-approved for the loan. Prior to being pre-approved, Elements Financial ran his credit report. The report listed three credit scores —802, 788, and 786—which were provided by Equifax, Experian, and TransUnion, respectively (Doc. 39-9, p. 1). The parties agree that Martin's credit score at this time was 788 (the median of the three scores) (Docs. 39; 39-10).   In order to qualify for a loan, Martin needed a minimum credit score of 680 (Doc. 42-4, p. 15). The credit report pulled for his Elements Financial loan was "good for four months," which means that the loan was approved for this amount of time with this credit report and did not require re-running his credit score (Doc. 39-15, pp. 3-4).

While Martin testified that he was not provided with the Citibank credit card until March 2018 (after he started the loan process), the record reflects that at the time of the aforementioned loan underwriting and pre-approval, the Citibank credit card appeared on his report (Doc. 39-14, p. 4). In this loan report, Martin is identified as an "authorized user" of the Citibank credit card. *Id.* The report further explains that this card contains a

"possible non-applicant debt" (*Id.* at p. 2). The report explains that if this debt is not attributed to the applicant, it should be documented in the file and removed from the report. *Id.* This Citibank credit card also appeared on Martin's In-file Credit Report obtained by Elements on February 14, 2018 (Doc. 39-10, p. 2).

Also on February 14, 2018, Ms. Beverly Marshall Patterson (Martin's loan agent with Elements Financial) issued a "Notice of Pre-Approval" for the loan, stating, "Final Loan Approval will be subject to, but not limited to a satisfactory appraisal and preliminary title report. This pre-approval will expire on May 15, 2018" (Doc. 39-7).

It appears Martin checked his credit score on or around April 22, 2018 and it had dropped to 660 (Doc. 39-16).[1]  He testified that he believed he checked his score around this time because of a conversation with Ms. Patterson (Doc. 42-5, pp. 13-14). Martin also claims Ms. Patterson told him in order for his loan to go forward, his credit score had to be higher. *Id.* But Martin's story lacks any evidentiary support and is undercut by his own phone records.[2]  Patterson testified that after February 14, 2018, she did not re-check Martin's credit score and, to her knowledge, no one else at Elements Financial checked it (Doc. 39-15, p. 2). She explained that Martin's credit was not re-checked because the original credit score was valid for four months (*Id.* at pp. 3-4). And even if Elements

---

[1] There is a date at the top of this exhibit; however, it is cut off and there is a handwritten date indicating this report was run on "4/22/18."

[2] While Martin testified that his conversation with Ms. Patterson would have occurred on his cell phone, his cell phone records show that no calls took place between Martin and Elements Financial prior to re-checking his credit score on April 22, 2018 (Doc. 44, p. 2).

Financial had known Martin's credit score had lowered, it would have no consequence on the approval of the loan (*Id.* at pp. 9-10).

Ms. Patterson further explained that she has no recollection of speaking to Martin during this time; rather, his loan application expired because no action was taken during those four months (*Id.* at pp. 4-6). In order to "take action" on the loan, Martin either had to make an offer on an existing home before May 15, 2018 or enter into a contract to build (*Id.* at p. 8). She was explicit the loan application was not denied (*Id.* at pp. 6-8).[3] Ms. Patterson explained that on Martin's credit report, he was identified as an "authorized user" of Mr. Yargus's credit card and the debt was not his; therefore, the credit card would have no effect on her decision about whether he qualified for a loan (*Id.* at pp. 9-11).

### III.    The impact of the Citibank credit card

In April 2018, Martin told Ms. Reedy at Central State that the Citibank credit card had adversely impacted his credit score. Ms. Reedy then checked her credit score and it had gone down as well, as she was also an authorized user on the card (Doc. 39-20, pp. 2-3).[4] Ms. Reedy wrote a generic letter on Central State's letterhead and dated it April 24,

---

[3] If the loan had been declined, there would be a decline letter in the file from the underwriter (Doc. 39-15, p. 5). Additionally, this letter would have been sent to Martin (*Id.*). Conspicuously, no such letter exists in the record.

[4] Ms. Reedy testified that she ultimately restored the drop in her credit score by pulling her credit report and submitting a dispute regarding the Citibank credit card (Doc. 39-20, pp. 4-7). She noted that she disputed any affect the card had on her credit by indicating that the card was a business account for which she was not personally responsible (*Id.*). Ms. Reedy also testified that she told Martin, and all of the other Central State employees who were authorized users, how to rectify any issue with the card and their credit score, if necessary (*Id.*).

2018, which stated that Martin was not responsible for the balance on the Citibank card (Doc. 39-21). The letter indicates the credit card is through "Central State Construction [which] will be paid by the company." *Id.*[5] Mr. Yargus learned of the issue with the credit cards from Ms. Reedy in April 2018. He testified that several employees' credit scores went down as a result of utilizing the Citibank credit card as authorized users (Doc. 42-2, p. 10). Mr. Yargus exchanged phone calls and text messages with Martin, indicating that he took responsibility for the issue with his credit score and that he would do what he could to rectify it (Doc. 42-2, pp. 13-15).

Martin acknowledged he did not have any evidence that Mr. Stone or Ms. Reedy (Central State's Senior VP and Secretary) knew the credit card would impact his credit negatively (Doc. 39-1, p. 2-5). Additionally, Martin testified that there is no evidence Mr. Yargus knew that putting his name on the credit card and issuing it to him as an authorized user would negatively impact his credit score (*Id.* at pp. 2-6). The record reflects that Mr. Yargus sent Martin an email on May 30, 2018, stating: "When I set up the credit cards, I never dreamed that it would effect[sic] anyone's personal credit ratings. As I explained to you and all effected[sic] that I would personally go to everyone's bank and explain the situation" (Doc. 39-17).

On June 10, 2018, Martin sent an email to Mr. Yargus resigning his employment from Central State because he did not feel as though "the HVAC department [was] going in the direction" that was originally intended (Doc. 39-2, p. 1). He further explained that

---

[5] It is unclear in the record what prompted this letter and whether Martin ever showed it to Elements Financial or anyone else.

he "felt as though [he] was giving 110% on and off the clock," but that this added effort did not help him in the company. *Id.* Martin indicated he would end his employment immediately for the betterment of his family and his health. *Id.* Martin did not mention the issues with the Citibank credit card in this email as one of his reasons for leaving the company.

### IV.     Miscellaneous post-employment events

Martin contends his health was impacted by the events surrounding the credit card. Dr. Jon Stockrahm, an internist, began treating him in 2002 (Doc. 42-8, pp. 2-3). On May 31, 2018,[6] Martin reported nose bleeds and chest tightness, both of which he indicated were related to anxiety (*Id.* at pp. 4-5).[7] Dr. Stockrahm's notes indicate that Martin reported he was under a lot of stress at work, which he believed may be the source of his anxiety (*Id.* at p. 5). Dr. Stockrahm testified that he recalled a conversation with Martin about an issue with his employer, or supervisor, using a credit card without his permission, Dr. Stockrahm could not remember when this conversation took place and it is not documented in his notes (*Id.* at p. 6). Following the May 31, 2018 visit, Dr. Stockrahm prescribed Zoloft to help reduce Martin's anxiety, which he assessed to be mild to moderate at that time (*Id.* at pp. 6, 12). Dr. Stockrahm testified that Martin's anxiety lasted from approximately May 31, 2018 until four weeks before he saw him again on September 20, 2018 (so approximately three months at most) (*Id.* at p. 11).

---

[6] This is approximately ten days before Martin resigned his employment with Central State.

[7] Dr. Stockrahm testified that Martin had experienced nose bleeds and chest tightness in the past and had been worked up for these issues (Doc. 42-8, p. 5).

Martin did not contact Elements Financial again until January 13, 2020, when he e-mailed Ms. Patter asking for the percentage rate from February 2018 and to send "confirmation that my loan was declined AFTER my pre-approval due to the reduction of my credit score to a 650" (Doc. 39-11) (capitalization in original). He also indicated he was "trying to document any increase in percentage rate of my loan from 2018 until now to prove it will cost me more on the same house to build in today's market." *Id.* Ms. Patterson responded the same day and explained that the interest rate for a construction loan was now *lower* than what he had been quoted in February 2018. She also reiterated that his 2018 loan had never been declined; rather, the loan application process expired since he did not take any action on the loan (Doc. 39-12). Specifically, Ms. Patterson wrote, "Since we did not pull your credit again, and the loan was canceled due to expiring, there is not a decline letter" (Doc. 39-12).

Mr. Yargus testified that he called his credit card company to take Martin off as an authorized user in 2018; however he was not removed as an authorized user until July 2020 (Doc. 42-2, pp. 16-18).

## DISCUSSION

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

(1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). If the moving party bears the burden of persuasion on an issue at trial, it must "lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. National Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015); *accord Felix v. Wisconsin Dep't of Transp.*, 828 F.3d 560, 570 (7th Cir. 2016). Where the moving party fails to meet that strict burden, the Court cannot enter summary judgment for that party even if the opposing party fails to present relevant evidence in response. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a motion for summary judgment, the nonmoving party may not simply rest upon the allegations contained in the pleadings, but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322–26; *Anderson*, 477 U.S. at 256–57; *Modrowski*, 712 F.3d at 1168. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact only exists if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252.

I.      **Counts I, II, and III: Fraud, Constructive Fraud, and Fraud by Concealment**

A. **Fraud**

In order to assert a claim of fraud, the plaintiff must establish the following:

(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement.

*See Davis v. G.N. Mortg. Corp,* 396 F.3d 869, 881-82 (7th Cir. 2005) (citing *Capiccioni v. Brennan Naperville, Inc.,* 791 N.E.2d 553, 558 (Ill. App. Ct. 2003)). "A claim for fraud, promissory or otherwise, requires a showing that, *at the time the allegedly fraudulent statement was made*, it was an intentional misrepresentation." *Ass'n Ben. Servs., Inc. v. Caremark RX, Inc.,* 493 F.3d 841, 852 (7th Cir. 2007) (emphasis in original). In demonstrating "reliance," a plaintiff must show "they justifiably relied on the statement and suffered damages resulting from that reliance." *Id.* And, "[m]ost importantly, fraud must be proved by clear and convincing evidence." *Id.*

In framing its argument on the fraud claim, Central State justifiably looks to Martin's Amended Complaint and notes that the purportedly fraudulent statements at issue here were those made by Central State that the credit card would not be tied to Martin personally and it would not affect him at all (*See* Doc. 39, pp 12-13; Doc. 19). Central State argues that it is entitled to summary judgment because Martin has no evidence to demonstrate that its employees knew that the statements at issue were false. Central State also argues that Martin has no evidence to demonstrate that any of the statements at issue were made for the purpose of inducing Martin to act. And finally,

Central State argues that Martin has failed to marshal any evidence of injury tied to the alleged representations. In response, Martin moves the goalpost, now claiming that the fraudulent statement is the representation that the credit card was a "company credit card" rather than a personal credit card.

As a general matter, the Court notes that the allegations specific to the fraud claim in the Amended Complaint (*see* Doc. 19, ¶¶ 47-55) are lacking any real particularity as to the actual fraudulent statements. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1954 (2009) (Fed. R. Civ. P. 9(b) requires claims for fraud to be plead with "particularity"); *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014) ("While the precise level of particularity required under Rule 9(b) depends upon the facts of the case, the pleading ordinarily requires describing the who, what, when, where, and how of the fraud.") (internal quotations omitted). In order to discern the specific allegations at issue, it is necessary to look to the general factual allegations of the Amended Complaint, which are incorporated by reference into the fraud claim.[8]  Accordingly, the Court agrees with Central State that the gravamen of Martin's fraud claim is that Central State employees specifically represented to him that the credit card would not be tied to him personally and it would not affect him at all (*Id*. at ¶¶ 18-23).

But the evidence simply does not support the fraud theory Martin advanced in his Amended Complaint. In fact, Martin's admissions are fatal to a fraud claim predicated

---

[8] The heightened pleading standard for fraud would seem to suggest that a plaintiff should not simply reincorporate factual allegations by reference when setting forth a fraud claim. Rather, in order to comply with the heightened pleading standard, it would seem appropriate to provide the who, what, where, when and how of the fraud claim in detail within the specific count setting forth the claim.

on these statements. There is simply no evidence that either Mr. Stone or Ms. Reedy knew the Citibank credit card would be tied to Martin's credit, personally, or that it would have any impact on him. When asked directly whether he had any evidence to show that Mr. Stone or Ms. Reedy knew the Citibank card would impact his credit negatively, Martin confirmed he did not (Doc. 39-1, pp. 2-5). Additionally, he testified that he has no evidence that Mr. Yargus knew putting his name on the Citibank account would negatively impact his credit score (*Id.* at pp. 2-6). Indeed, Ms. Reedy, who Martin attributes this conduct to (along with Stone) also was an authorized user of the Citibank card and had her credit score impacted. She certainly would not have done so had she known that the card would be tied to her personally or impact her credit. Accordingly, Martin cannot satisfy the critical second element of his fraud claim (knowledge that the statements were false) with respect to the representations outlined in his Amended Complaint.

But even if the Court considers the representation outlined in Martin's response brief (that the credit card was a "company card"), his fraud claim still fails. It is questionable here whether there is sufficient evidence to establish that Mr. Stone made this representation intentionally knowing that it was false. It would seem that in order to satisfy this element, Martin would need to show an understanding of the difference between an authorized user of the company president's credit card versus a company credit card (as outlined in his brief, *see* Doc. 42, p. 10). But setting this issue aside, what is unequivocally clear is that there is no evidence to establish that Martin relied on this statement and suffered damages resulting from that reliance. Rather, the evidence shows

that Martin was solely focused on clarifying from Mr. Stone and Ms. Reedy that the credit card would not affect him at all (Doc. 42-5, pp. 8-11).[9] So even accepting Martin's theory advanced for the first time in his response in opposition, there is still a critical element missing – reliance on that representation. Moreover, there is simply no way Martin could tie any damages to that particular representation since he clearly did not rely on it, as evidenced by his own testimony. Ultimately, Martin's own admissions are fatal to his fraud claim and it must fail.

### B. Constructive Fraud and Fraud by Concealment

The Court next turns to Martin's claim for constructive fraud. Unlike actual fraud, constructive fraud "requires neither actual dishonesty nor intent to deceive" but is instead conduct that breaches a legal or equitable duty, which the law declares fraudulent because of its tendency to deceive others. *Joyce v. Morgan Stanley & Co., Inc.*, 538 F.3d 797, 800 (7th Cir. 2008) (internal citations omitted*); Prodromos v. Everen Sec., Inc.*, 793 N.E.2d 151, 158 (Ill. App. Ct. 2003). "Constructive fraud includes any act, statement or omission which amounts to positive fraud or which is construed as a fraud by the courts because of its detrimental effect upon public interests and public or private confidence." *Joyce,* 538 F.3d at 800 (internal citations omitted). In order to make a claim of constructive fraud, a plaintiff needs to establish the existence of a confidential or fiduciary relationship. *Id.*

---

[9] Specifically, Martin testified that he accepted the credit card "[r]eluctantly, but Ron [Stone] was guaranteeing me that it would not effect me in any way, shape or form that may name is on that card for identification purposes. So I asked Ron, again, to make sure this will not effect me in any way, shape or form, because I'm trying to go through with my construction on my house, and he assured me that it would not effect me." (Doc. 42-5, p.8-9).

Then, the defendant needs to breach that fiduciary duty, know of the breach, and accept the "fruits of the fraud." *Id.* Constructive fraud "requires the existence of a confidential or fiduciary relationship" and a "plaintiff claiming constructive fraud must show that defendant (1) breached the fiduciary duty he owed to plaintiff and (2) knew of the breach and accepted the fruits of the fraud." *Id.* (internal citations omitted).

> In Illinois, fraudulent concealment has five elements:
>
> (1) the concealment of a material fact; (2) the concealment was intended to induce a false belief, under circumstances creating a duty to speak; (3) the innocent party could not have discovered the truth through a reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and relied upon the silence as a representation that the fact did not exist; (4) the concealed information was such that the injured party would have acted differently had he been aware of it; and (5) that reliance by the person from whom the fact was concealed led to his injury.

*Stewart v. Thrasher*, 610 N.E.2d 799, 804 (Ill. App. Ct. 1993) (internal citations and quotations omitted). But like constructive fraud, fraud by concealment requires a plaintiff to demonstrate justifiable reliance as well as the existence of a special or fiduciary relationship giving rise to a duty to convey accurate information. *Schrager v. N. Cmty. Bank*, 767 N.E.2d 376, 384 (Ill. App. Ct. 2002); *Taylor v. Kilmer,* No. 18-c-7403, 2021 WL 76828, at *2 (N.D. Ill. Jan. 8, 2021). The plaintiff must allege that one party has a duty to speak, "arising out of a confidential or fiduciary relationship, to reveal hidden facts to the other party." *Van Pelt v. Bona-Dent, Inc.,* No. 17 C 1128, 2018 WL 2238788, at *5 (N.D. Ill. May 16, 2018) (quoting *Lillien v. Peak6 Invs., L.P.*, 417 F.3d 667, 672 (7th Cir. 2005)). "A duty to disclose may be based on a fiduciary relationship or a relationship of trust and confidence where 'defendant [is] in a position of influence and superiority over

plaintiff.'" *Id.*

Because both constructive fraud and fraud by concealment require a plaintiff to establish a fiduciary duty, the Court will begin its analysis here. A fiduciary relationship may be found in one of two ways: it can be presumed as a matter of law or it may be found based on the facts of a particular situation. *Hensler v. Busey Bank*, 596 N.E.2d 1269, 1274 (Ill. App. Ct. 1992). An example of a fiduciary relationship that "exist[s] as a matter of law," is the attorney-client relationship. *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 782 (7th Cir. 2015). When a party contends that a fiduciary relationship exists based on the facts of the case, Illinois law requires that the "facts from which the fiduciary relationship arises be 'pleaded and proved by clear and convincing evidence.'" *Id*. at 788, n5 (quoting *Hensler*, 596 N.E.2d at 1275); *Westmore Equities, LLC v. Village of Coulterville,* No. 15-cv-0241-MJR-DGW, 2016 WL 5724143, *3 (S.D.Ill. Sept. 30, 2016).

In general, "[a] fiduciary relationship exists when there is a special confidence reposed in one, who, in equity and good conscience, is bound to act in good faith and with due regard to the interest of the one reposing the confidence." *Hensler*, 596 N.E.2d at 1275. "The factors to be considered in determining whether a fiduciary relationship exists include the degree of kinship, disparity of age, health and mental condition, and the extent to which the allegedly servient party entrusted the handling of his business and financial affairs to and reposed faith and confidence in the dominant party." *Id*.

Martin says his employment contract shows that a fiduciary relationship exists. He assumes that he owes Central State a fiduciary duty, based on his employment contract, and so he frames the issue as whether the fiduciary duty is reciprocal from

Central State to him. Martin concedes this is a question of first impression for the Court, and thus he has no authority to support his position.

But the Court does not see this as a matter of first impression. In fact, the law is quite clear that an employer does *not* owe a fiduciary duty to its employee. *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 455 (7th Cir. 2012) (the plaintiff's claim for breach of fiduciary duty was properly dismissed because the plaintiff, a former employee, was an associate attorney at the law firm and therefore in an employer/employee relationship "and in Illinois, this relationship does not give rise to a fiduciary duty."); *Vargas v. Esquire, Inc.*, 166 F.2d 651, 654 (7th Cir. 1948) (the existence of an employee-employer relationship is not sufficient to establish a fiduciary relationship);*Katz v. Nw. Orthopaedics & Sports Med. Ltd.*, No. 18 CV 4515, 2020 WL 1986965, at *16 (N.D. Ill. Apr. 27, 2020) ("the existence of an employer-employee relationship, without more, does not create a fiduciary duty"). *Cf Westmore Equities*, 2016 WL 5724143 at *3; *Avila*, 801 F.3d at 784 (contract law imposes an implied duty of good faith on parties empowered by the contract, but that does not create a fiduciary relationship). In sum, it is abundantly clear to this Court that Central State does not owe Martin a fiduciary duty as a matter of law.

Nor can Martin credibly argue that a fiduciary relationship was created based on the facts of this case. He worked as an Assistant Vice President for Plumbing Operations for Central State. But there is no indication that he had any form of ownership interest in Central State, that there was any sort of profit sharing, or that there was anything unique about his role where special faith and confidence was placed in him regarding financial affairs. *But see Hess,* 668 F.3d at 455 (partners in a law firm may owe one another a

fiduciary duty because of their profit sharing arrangements). Rather, Martin's employment with Central State appeared to be a fairly standard employment agreement that was terminable *at will*, meaning either Martin or Central State could terminate the employment contract at any time (Doc. 39-4).[10]

Martin attempts to distinguish *Hess* by relying on dicta from an Illinois appellate court decision – *Hytel Grp., Inc. v. Butler*, 938 N.E.2d 542, 557 (Ill. App. Ct. 2010). But Martin's reliance on this case is neither persuasive nor on point. In *Hytel*, the court made a passing comment that that an "employee who is not an officer or director of a corporation" does not owe a fiduciary duty to the corporation. *Id*. But this passing comment is dicta and it simply does not stand for the proposition that Martin wants it to stand for - that an officer or director is necessarily owed a fiduciary duty from the corporation. Moreover, the discussion in *Hytel* that Martin cites to was much more focused on whether the trial court should have given leave to amend rather than a robust discussion of fiduciary duty. Accordingly, Martin's reliance on *Hytel* is simply unavailing.

The Court is convinced that Central State did not owe Martin a fiduciary duty as a matter of law. Nor was a fiduciary relationship created here based on the facts of the case. Accordingly, Martin's claims for constructive fraud and fraud by concealment must fail.

## II.    Count IV — Negligent Misrepresentation

---

[10] *See* The Illinois Department of Labor, *Frequently Asked Questions*, https://www2.illinois.gov/idol/faqs/pages/default.aspx (last visited August 18, 2021).

To prove a claim of negligent misrepresentation under Illinois law, Martin must show the following:

> (1) a false statement of material fact, (2) carelessness or negligence in ascertaining the truth of the statement by the party making it, (3) an intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statements, (5) damage to the other party resulting from such reliance, and (6) a duty on the party making the statement to communicate accurate information.

*Turubchuk v. S. Illinois Asphalt Co., Inc.*, 958 F.3d 541, 547 (7th Cir. 2020) (citing *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 843 N.E.2d 327, 332 (Ill. 2006).

Central State argues that this claim fails for three reasons. The first is that Martin cannot demonstrate that Central State owed him a duty to communicate accurate information. Second, Central State argues that there is no evidence in the record demonstrating that it was careless or negligent in ascertaining the truth of the statement at issue (the second element). Finally, Central State argues there is no evidence in the record of Ms. Reedy or Mr. Stone's intention to induce Martin to act (the third element) (Doc. 39, pp. 14-15). Martin argues that Central State owed a duty to avoid conveying false information because Mr. Yargus "was in the business of supplying information for his and Defendant's economic benefit to a third party (Citibank Mastercard)"(Doc. 42, p. 13). Martin also argues that this false information resulted in physical harm and harm to his property.

In Illinois, the economic loss doctrine provides that a plaintiff cannot recover damages for a purely economic loss for actions sounding in tort. *See Moorman Mfg. Co.* v. *Nat'l Tank Co.*, 435 N.E.2d 443 (Ill. 1982). However, there is an exception to this general

rule when it comes negligent misrepresentation. *Wheaton Theatre, LLC v. First American Title Insur. Comp.*, No. 18-c-5248, 2019 WL 10371609 (N.D. Ill. April 8, 2019). But this critical exception requires that the defendant must be in the business of supplying information for the guidance of others in their business transactions. *Id.* Whether a party is in the business of supplying information for purposes of a negligent misrepresentation claim is a question of law to be decided by the court. *Instituto Nacional De Comercializacion Agricola (Indeca) v. Cont'l Illinois Nat. Bank & Tr. Co.*, 858 F.2d 1264, 1267 (7th Cir. 1988). "Two requirements must be met: First, the defendant must supply the information in the course of his business and second, the information must be supplied for the guidance of others in their business transactions . . . with *third* parties." *Gondeck v. A Clear Title & Escrow Exch., LLC*, 47 F. Supp. 3d 729, 749 (N.D. Ill. 2014) (internal quotations omitted) (emphasis in original). Illinois courts have strictly applied the "in the course of his business" requirement, holding that defendants who are sellers of tangible products or services are not in the business of supplying information to others even where they provide the plaintiff with information "in the course of" the business that they conduct. *Id.* (citing *Orix Credit All., Inc. v. Taylor Mach. Works, Inc.*, 125 F.3d 468, 475 (7th Cir. 1997)) ("Courts have consistently held that manufacturers of tangible noninformational goods—such as chemical compounds, roofing materials, or computer systems-are not in the business of supplying information.").

There is no evidence in the record to support the notion that Central State, a heating and cooling company, is in the business of supplying information for the guidance of others in their business transactions. Martin attempts to argue the Central

State was in the business of providing information/guidance to its employee, Martin, and thus can maintain a negligent misrepresentation claim. But Martin offers no legal authority to support the position that a heating and cooling company can be in the business of providing information to its *own* employees. And even following Martin's faulty logic, there is still no evidence suggesting that the information provided to Martin was for use in business transactions with third parties. *See Gondeck*, 47 F. Supp. at 749. Central State provided tangible products and services and was simply not in the business of providing information to others for use in business transactions with third parties. *Id.* ("defendants who are sellers of tangible products or services are not in the business of supplying information to others even where they provide the plaintiff with information 'in the course of' the business that they conduct.").

Martin advances one additional argument to try and prevent summary judgment on the negligent misrepresentation claim. He points to a single Illinois Supreme Court case, *Board of Education v. A, C, and S, Inc.,* which held that physical injuries resulting from a party's reliance on information supplied negligently can sustain a negligent misrepresentation claim.[11] 546 N.E.2d 580, 590.    In *Board of Education*, the Illinois Supreme Court relied on the Second Restatement of Torts §311, in explaining that "the rule of liability in section 311 extends to any defendant 'who, in the course of an activity which is in furtherance of his own interests, undertakes to give information to another,

---

[11] In *Board of Education,* the plaintiffs appealed the dismissal of a negligent misrepresentation claim in an asbestos case – specifically that defendant had previously made representations that asbestos-causing materials were safe.

and knows or should realize that the safety of the person or others *may depend upon the accuracy* of the information." *Id.* at 593 (emphasis added). Here, there is no evidence Central State's employees knew or should have known that the safety of Martin depended on the accuracy of the information conveyed in providing him the Citibank credit card. There is no evidence that Central State had any knowledge about the "dangerous propensity" of credit card and the statements made surrounding the credit card. *Id.* ("[plaintiffs] must prove that the defendants knew or should have known of the dangerous propensity of the [asbestos containing materials] and that the statements made were to induce the plaintiffs to purchase the products."). Nor is there any evidence to suggest these statements were in fact dangerous. Accordingly, Martin's claim for negligent misrepresentation must fail at summary judgment.

## III.    Count V—Negligence

Under Illinois law, to establish a claim of negligence, a plaintiff must prove the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach. *Swearingen v. Momentive Specialty Chemicals, Inc.*, 662 F.3d 969, 972 (7th Cir. 2011) (*citing Thompson v. Gordon*, 948 N.E.2d 39, 45 (Ill. 2011)). Though each of the elements is necessary, the Court specifically notes that there is no tort of negligence without the breach of a duty owed. *See Westmore Equities, LLC v. Vill. of Coulterville*, No. 15-CV-0241-MJR-DGW, 2016 WL 5724143, at *3 (S.D. Ill. Sept. 30, 2016 (citing *Glade ex rel. Lundskow v. United States*, 692 F.3d 718, 721-22 (7th Cir. 2012)).

Central State contends that Martin has failed to produce any evidence it had a duty to communicate to him the credit card would or could affect his credit score or that Central State breached any duty to him. In response, Martin points the Court to *Brogan v. Mitchell Int'l, Inc.*, 692 N.E.2d 276 (Ill. 1998), to contend that Central State owed a duty to avoid conveying false information where the information results in physical injury to a person or harm to property. From the outset, it is important to note that in *Brogan*, the issue on appeal was whether there is "a legal duty to avoid negligent misrepresentations that cause emotional, rather than physical, harm." *Id.* at 276. In other words, the claim at issue was for negligent misrepresentation, and not a claim of general negligence. *Id.* In *Brogan* the Illinois Supreme Court made clear that there is a "duty to communicate accurate information only in two circumstances." *Id.* at 278. First, there is a duty to avoid negligently conveying false information that results in physical injury to a person or harm to property. *Id.* And second, there is a duty to avoid negligently conveying false information when one is in the business of supplying information for the guidance of others in their business transactions.

The Court will address these two circumstances in reverse order. It is abundantly clear that Central State was *not* in the business of supplying information for the guidance of others in their business transactions. *See supra*, pp. 18-21. It was a heating and cooling company providing tangible goods and services to customers. *Id.* It was certainly not in the business of supplying information about credit cards for the guidance of its employees as Martin previously argued.

And, as demonstrated above, Martin has not connected any of the physical injury he claims to a negligent misrepresentation. The very case Martin relied on for this issue – *Bd. of Educ. of City of Chicago*, 546 N.E.2d at 593 - made clear that the person who undertakes to give information to another must *know or should know* that the safety of the person may depend on the accuracy of the information. Here, there is simply no evidence that employees of Central State knew or should have known that Martin's safety, health, or well-being depending on the accuracy of the information conveyed about the credit card. Indeed, there is nothing in the record from which it could even be inferred that Central State employees knew of the "dangerous propensity" concerning the credit card. This makes sense because if so, Ms. Reedy (Central State's Secretary), certainly would not have become an authorized user of the credit card as well.

Accordingly, the principal case Martin relies to support his negligence claim actually demonstrates that his negligence claim must fail. There is no duty here and absent a duty, Martin has no claim for negligence.[12]

## IV.   Count VI—Intentional Infliction of Emotional Distress

In order to state a claim for intentional infliction of emotional distress, the plaintiff must show three things:

> First, the conduct involved must be truly extreme and outrageous. Second, the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct

---

[12] The *Moorman* doctrine, which provides that a plaintiff cannot recover damages for purely economic loss in actions sounding in tort, prevents Martin from pursuing his negligence claim for purely economic damages. *Moorman Mfg. Co*, 435 N.E.2d at 452.

will cause severe emotional distress. Third, the conduct must in fact cause severe emotional distress.

*Lipari v. Sullivan,* No. 17 CV 1566, 2018 WL 6604251, at *15 (N.D. Ill. Dec. 17, 2018)(quoting *Vance v. Changler,* 231 Ill.App.2d 747, 751 (3rd Dist. 1992)).[13]

Central State's motion for summary judgment focuses on whether its employees intended to inflict emotional distress on Martin in their statements to him about the Citibank credit card. This makes sense, given that Martin's Amended Complaint supports this claim with allegations that Central State failed to disclose that the credit card could affect his credit score and knew or should have known that it would (Doc. 19, ¶¶ 78-81). In his response, Martin moves the goalpost again and says this claim is predicated on Central State's failure to remove him as an authorized user on the credit card until July 2020 (two years after his employment ended with Central State).

The first element of the intentional infliction of emotional distress claim requires evidence of conduct that is truly extreme and outrageous. Only conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency" qualifies as "truly extreme and outrageous." *Lipari*, 2018 WL 6604251, at *15, citing to *Pub. Fin. Corp. v. Davis*, 66 Ill.2d 85, 89–90 (1976) ("liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions or trivialities"); *Rudis v. Nat'l Coll. of Educ.*, 548 N.E.2d 474, 477 (Ill. App. Ct. 1989) ("Illinois

---

[13] *See also Honaker v. Smith,* 256 F.3d 477, 490 (7th Cir.2001) ("In Illinois, a plaintiff must satisfy three requirements for a showing of intentional infliction of emotional distress: '(1) the conduct involved must be truly extreme and outrageous; the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress[;] and (3) the conduct must in fact cause severe emotional distress.").

courts have essentially restricted the tort of intentional infliction of emotional distress to those cases in which the defendant's conduct is so abusive and atrocious that it would cause severe emotional distress to a person of ordinary sensibilities").

If Martin's claim is predicated on the issuance of the credit card and the statements made by Central State employees, the Court is skeptical that any reasonable juror would deem that conduct to be truly extreme and outrageous. But even setting this first element aside, there is simply no evidence that anyone at Central State intended to cause Martin severe emotional distress or knew that it was highly probable that making him an authorized user on the credit card would cause him emotional distress. Martin himself has admitted that he does not have evidence that Central State's employees, including Ms. Reedy, Mr. Stone, or Mr. Yargus, knew that the Citibank credit card would negatively impact Plaintiff's credit score (Doc. 39-1, pp. 2-6). And finally, there is no evidence that this conduct caused Martin *severe* emotional distress. Even setting aside the issue of causation, Martin's treating physician described his anxiety as "mild to moderate" and it lasted for a period of three months (Doc. 42-8, p. 12).

If, as Martin contends, this claim is predicated on Central State's failure to remove him as an authorized user, this too fails. It is clear that failing to assure that Martin was removed from the Citibank card as an authorized user for two years is certainly a significant oversight, but it does not fit neatly into the description of behavior "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Thomas v. Fuerst,* 803 N.E.2d 619, 625 (Ill. App. 1st 2004). But again here, there is no evidence Central State *intended* to cause Martin severe emotional distress. It's a

closer call as to whether its "highly probable" that leaving Martin as an authorized user could cause severe emotional distress. But nevertheless, the evidence confirms that any stress Martin did have, resolved in 2018 (*see* Doc. 42-8, p. 11). In other words, there is no evidence that leaving Martin as an authorized user until 2020 did, in fact, cause him severe emotional distress. The only evidence of emotional distress in the record occurred for three months in 2018 – two years before he learned that he was still an authorized user. Accordingly, Martin's claim for intentional infliction of emotional distress must also fail.

## V.  Count VII-Negligent Infliction of Emotional Distress

To succeed on a negligent infliction of emotional distress claim, a  plaintiff  must show that: (1) the defendant owed plaintiff a duty; (2) the defendant breached this duty; and (3) this breach proximately caused plaintiff's injury. *Miller v. Zaruba,* No. 10 C 6533, 2011 WL 1630679, at *3 (N.D. Ill. Apr. 28, 2011) (citing *Parks v. Kownacki,* 737 N.E.2d 287, 296–97 (Ill. 2000)). There are two different types of plaintiffs in a negligent infliction of emotional distress claim: (1) direct victims and; (2) bystander victims. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009) ("In evaluating these claims, Illinois courts separate 'bystanders' from 'direct victims.'").

This distinction is important because there are different legal standards for claims made by direct victims as opposed to claims made by a bystander victim. Direct victims of negligent infliction of emotional distress are "the persons that the negligent conduct has directly affected; they are the ones that are actually physically injured by the defendant's negligent conduct. To fall in this category the plaintiff must suffer some

contemporaneous physical contact that caused the emotional distress." *LaRiviere v. Brd. Of Trustees of Southern Ill. Univ.*, 2018 WL 4491183, at *11 (S.D.Ill. Sept. 19, 2018) (citing *Barnes v. Anyanwu*, 391 Fed. App'x 549, 552 (7th Cir.2010)). "[I]n order to recover for negligent infliction of emotional distress under Illinois law, a direct victim must show he suffered a physical injury or impact." *Id.* at 554.

A bystander victim, meanwhile, does not need to "suffer a physical impact or injury at the time of the negligent act, but they must have been in such proximity to the accident that there was a high risk and fear of physical impact to them." *Barnes*, 391 Fed. App'x at 552. "And—and this is an important 'and'—bystanders must show a physical injury or illness as a result of the emotional distress caused by the defendant's negligence." *Id*. (internal quotations omitted).

Martin claims he is a "direct victim," as he suffered a physical injury (*e.g.,* anxiety and nose bleeds) as the result of Central State's actions (Doc. 42, pp. 14-15). But his entire argument appears to be predicated on a misunderstanding of the legal distinction between direct victims and bystander victims. He cites to *Corgan v. Muehling*, 574 N.E.2d 602 (Ill. 1991), contending that this case established that a physical impact is not required for a negligent infliction of emotional distress claim. But this is a misread of *Corgan*. In *Corgan*, the Illinois Supreme Court made clear that the "zone-of-physical danger rule" rather than the impact rule applies "only in bystander cases." *Id*. at 304. The Illinois Supreme Court made clear that had implemented the zone-of-physical danger rule (and

abandoned the impact rule) for bystander cases only. *Id.* at 605.[14] The Illinois Supreme

Court in *Corgan* left no doubt that the impact rule still governed in direct victim cases: the

"zone-of-danger test does not apply to the instant case, *as the plaintiff was a direct victim*

*and not a bystander.*" *Id.* at 606 (emphasis added).

Ultimately though, there is simply no evidence in the record demonstrating that

Martin suffered any physical or emotional injury as a result of any form of direct physical

impact. Nor is there any evidence that Martin has suffered physical or emotional injury

as a result of being in close proximity to an incident where there was a high risk of

physical impact. This case is just not about a physical impact or near miss in any form or

fashion. Accordingly, this claim likewise fails.

## VI.    Counts VIII and IX—Punitive Damages and Injunctive Relief

As an initial matter, Martin agrees that injunctive relief is no longer appropriate

since as of July 2020, he was removed as an authorized user of the Citibank credit card.

Accordingly, this claim is now moot.

With regard to Martin's claim for punitive damages, this claim necessarily fails

because summary judgment is appropriate as to every claim he has advanced in his

Amended Complaint. Without a viable legal theory, Martin's claim for punitive damages

cannot move forward.

---

[14] Martin also cited *Leonard v. Kurtz*, 600 N.E.2d 896, 897–98 (Ill. App. Ct. 1992) to support his position, but this case is also unavailing. In *Kurtz*, the court made clear: "In 1983, our supreme court adopted the zone of physical danger rule as an *exception to the physical impact requirement*. The *zone of physical danger rule allows a bystander to an accident* to plead a cause of action for negligent infliction of emotional distress." *Id.* (emphasis added).

## CONCLUSION

For the aforementioned reasons, Defendant Central State Construction Inc.'s motion for summary judgment (Doc. 39) is **GRANTED**. Plaintiff Gary Martin's claims against Defendant are **DISMISSED with prejudice** and this case will be closed on the Court's docket.

**IT IS SO ORDERED.**

**DATED: August 23, 2021**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**